178 N.J. Super. 487 (1981)
429 A.2d 590
IN THE MATTER OF ROBERT KAPLAN, D.O., PETITIONER-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 3, 1981.
Decided March 19, 1981.
*491 Before Judges MATTHEWS, MORTON I. GREENBERG and COLEMAN.
Richard C. Borton argued the cause for appellant (Michael N. Kouvatas, attorney).
Ivan J. Punchatz, Deputy Attorney General, argued the cause for respondent (John J. Degnan, Attorney General; Erminie L. Conley, Assistant Attorney General, of counsel).
The opinion of the court was delivered by COLEMAN, J.S.C. (temporarily assigned).
This is an appeal from a final administrative decision rendered by the Director of the Division of Medical Assistance and Health Services (DMAHS), wherein appellant was ordered to pay the Medical Assistance and Health Services program (Medicaid) the sum of $8,711.96 under the civil penalty provisions of N.J.S.A. 30:4D-17(c). DMAHS was also ordered to pay appellant the sum of $4,477.80 for claims filed prior to his suspension.
The facts were essentially undisputed. On December 21, 1971 DMAHS suspended appellant indefinitely as a health care provider under the Medicaid program for failure to produce requested *492 records. The suspension was affirmed on appeal to this court on January 4, 1974. On October 5, 1972 appellant was charged in a 30-count indictment with Medicaid fraud in violation of N.J.S.A. 30:4D-17. On June 27, 1973 he was convicted on three counts of the said indictment involving four recipients totalling $154. On July 31, 1973 appellant was sentenced to a suspended 12- to 15-month term to State Prison and a $3,000 fine was imposed. At the time of sentencing the State represented that appellant had no pending charges against him. On December 18, 1973 applicant's license to practice medicine and surgery was suspended by the New Jersey Board of Medical Examiners. On June 12, 1975 this court affirmed the criminal convictions and on September 16, 1975 the Supreme Court denied certification. 68 N.J. 483. On September 18, 1975 a deputy attorney general wrote a letter to appellant's then attorney acknowledging that an administrative hearing was still pending since an earlier date in 1975 for purposes of determining the amount of reimbursements to be made to DMAHS and what amount of money should be paid over to appellant. The letter acknowledged that the administrative hearing had been postponed since early 1975 by request of appellant while his appeal from the criminal convictions was pending.
Effective September 15, 1976 the Legislature amended N.J.S.A. 30:4D-17(c) to increase the civil remedies from recovery of the overpayment to treble damages, interest and a penalty of $2,000 for each excessive claim. No action was taken on the administrative hearing to fix the reimbursement or to pay appellant until November 21, 1977, when appellant's new attorney wrote to Prudential, the fiscal intermediary of Medicaid, seeking payment of outstanding claims previously submitted. On March 15, 1978 DMAHS filed the administrative action seeking payment of the civil penalties in accordance with the September 15, 1976 amendment to N.J.S.A. 30:4D-17(c). Said amendment provided that it would retroactively apply to all pending and subsequent judicial and administrative proceedings.
*493 The administrative law judge concluded that appellant was due $4,477.50 without interest for unpaid claims, and that DMAHS did not have a pending administrative recovery action pending on September 15, 1976 and thus was not entitled to any recovery. The DMAHS Director affirmed the grant to appellant but rejected the administrative law judge's conclusion that DMAHS did not have a pending case or claim on September 15, 1976. The Director concluded that the letters between the deputy attorney general and appellant's attorney in September and October 1975 evidenced a pending administrative recovery action that had been suspended during appellant's appeal from his criminal conviction.
Appellant argues that (1) no administrative recovery action was pending on September 15, 1976; (2) the retroactive application of the said statute to him is an ex post facto law and denies him due process; (3) he is entitled to payment for all claims submitted; (4) he is entitled to interest on the reimbursement and (5) he is entitled to counsel fees.
A serious question exists as to whether an administrative proceeding was pending on September 15, 1976 within the meaning of N.J.S.A. 30:4D-17(c). We have not been supplied a copy of the alleged 1974 demand for administrative recovery. The letters in 1975 between the deputy attorney general and appellant's then attorney are inconclusive. Since we have decided to reverse for other reasons, we need not reach this question.
Article I, § 10 of the United States Constitution prohibits a state from passing any ex post facto law. This prohibition limits the powers of the states only with regard to the imposition of criminal punishment. Harisiades v. Shaughnessy, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952), reh. den. 343 U.S. 936, 72 S.Ct. 767, 96 L.Ed. 1344 (1952). Whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction. The first level of inquiry is whether the Legislature has indicated an intention to establish a civil or criminal penalty. United States v. Ward, 448 U.S. 242, *494 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). The Legislature has clearly denoted the penalizing mechanism of N.J.S.A. 30:4D-17(c) (1976) as a "civil" one.
Several recent federal cases hold that designation by Congress of a penalty as civil is dispositive for the purpose of determining whether retroactive application of the penalty violates the constitutional ban on ex post facto laws. United States v. Great Atlantic & Pacific Tea Co., 342 F. Supp. 272 (D.Md. 1972); Federal Election Comm'n v. Weinstein, 462 F. Supp. 243 (D.D.N.Y. 1978); Federal Election Comm'n v. Lance, 617 F.2d 365 (5 Cir.1980); United States v. Gianoulis, 183 F.2d 378 (3 Cir.1950). Under federal law, however, there is a second level of inquiry where the legislature has indicated an intention to establish a civil penalty. This is "whether the statutory scheme was so punitive either in purpose or effect as to negate that intention." Ward, supra, 448 U.S. at 249, 100 S.Ct. at 2641, 65 L.Ed.2d at 749. The standard required to show this is quite rigid and "only the clearest proof ... suffice[s] to establish the unconstitutionality of a statute on such a ground." Id., citing Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960), reh. den. 364 U.S. 854, 81 S.Ct. 29, 5 L.Ed.2d 77 (1960).
The case of Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), enumerates elements to be considered in determining whether an ostensibly civil remedy is actually a criminal penalty. We find the penalties provided for by N.J.S.A. 30:4D-17(c), as amended in 1976, are not so punitive as to constitute criminal punishment under these criteria, and the punitive aspects are outweighed by the nonpunitive features of the statute. For example, the monetary penalties of N.J.S.A. 30:4D-17(c) are not excessive in relation to the funds expended by the State for prosecution of Medicaid fraud cases and recovery of money paid for fraudulent Medicaid claims.[1]
*495 New Jersey does not define "ex post facto law" any more expansively than does federal law. See Lindsley v. State Prison Bd. Managers, 107 N.J.L. 51 (Sup.Ct. 1930), aff'd 108 N.J.L. 415 (E. & A. 1931); State v. Donato, 106 N.J.L. 397 (E. & A. 1929). Similarly, in New Jersey, as under federal law, the prohibition against ex post facto laws applies only to laws of a penal and criminal nature, State, Bonney v. Collector of Bridgewater, 31 N.J.L. 133 (Sup.Ct. 1864), and administrative or judicial proceedings to collect penalties have been recognized as noncriminal  that is, civil  in nature. Sawran v. Lennon, 19 N.J. 606, 612 (1955); Conservation and Ec. Dept. v. Scipio, 88 N.J. Super. 315, 320 (App.Div. 1965), certif. den. 45 N.J. 598 (1965).
In sum, we conclude that the retroactive application of N.J.S.A. 30:4D-17(c) (1976), as authorized by § 3 of that statute, does not violate Art. I, § 10 of the Federal Constitution nor does it violate Art. IV, § 7, par. 3 of the New Jersey Constitution of 1947. Thus, appellant's ex post facto argument must fail.
Appellant's due process attack on the retroactive application of the statute in question deserves consideration. In determining constitutionality it must be noted that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations or imposes a new duty or liability on past acts. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). The retrospective aspects of legislation must, however, meet the test of due process, which prohibits retrospective civil legislation where the consequences are particularly "harsh and oppressive." United States Trust Co. v. New Jersey, 431 U.S. 1, 17, 97 S.Ct. 1505, 1515, 52 L.Ed.2d 92 (1977). The justification for the law must be examined and weighed against the possibility that a person who could have anticipated the potential liability would have avoided it by altering his course of conduct. Usery, supra, 428 U.S. at 17, 96 S.Ct. at 2893.
*496 It is clear that N.J.S.A. 30:4D-17(c) (1976) has as its purpose the recovery of the State's costs of investigation and prosecution of Medicaid fraud cases although this is not articulated in either the statute or the legislative history. On balance, however, it seems likely that appellant would have altered his conduct had he been able to anticipate the statute. The conduct he would have altered might not have been his original criminal acts. Rather, he could have chosen to avoid having anything pending when the statute was passed. It seems reasonable that appellant would have paid the $154 overpayment and ended all claims DMAHS could make against him. Obviously, appellant did not prosecute an appeal from his criminal conviction to avoid paying the $154. Surely he would have paid the $154 had he been aware of the economic penalties imposed by the 1976 amendment. Under the facts of this case the retroactive application of the civil penalties had a most chilling effect upon appellant's exercise of his right of appeal in the criminal case.
While both sides of this due process balancing equation are equally viable and defendable, even a determination that due process was not violated "may not be enough to affirm the validity of ... [an action] of an administrative agency." O'Neal v. N.J. Parole Board, 149 N.J. Super. 174, 186 (App.Div. 1977), app. dism. 75 N.J. 590 (1977), citing Avant v. Clifford, 67 N.J. 496, 520 (1975). In exercising the function of review of actions of administrative agencies, New Jersey courts must not be "satisfied with enforcement of naked constitutional right, but ... [must go] further to strike down arbitrary action and administrative abuse and to insure procedural fairness in the administrative process". Avant, supra at 520.
Thus, while retroactive application of N.J.S.A. 30:4D-17(c) (1976) may not, per se, amount to a violation of due process, we find that retroactive application of the statute in this case violates notions of fundamental fairness and becomes harsh and oppressive. Kaplan was suspended as a Medicaid provider on December 21, 1971 for failure to provide patient *497 records requested by DMAHS, was indicted for Medicaid fraud in October 1972, and was tried and sentenced in June and July 1973. In June 1975 his conviction was upheld on appeal. Yet DMAHS did not institute proceedings for recovery of civil penalties until March 15, 1978, nearly five years after Kaplan had been convicted of Medicaid fraud, almost three years after his conviction was affirmed, and 2 1/2 years after civil penalties were first provided for by statute. Such a retroactive application of N.J.S.A. 30:4D-17(c) (1976) is arbitrary, capricious and unreasonable and abuse of agency discretion. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-563 (1978). DMAHS's determination that Kaplan is liable for civil penalties of $8,711.96 under N.J.S.A. 30:4D-17(c) (1976) must therefore be reversed.
Appellant further argues that he is entitled to reimbursement for all unpaid Medicaid claims submitted by him between February 1971 and February 1973, for the following reasons: regulations prohibiting a suspended provider from submitting claims for payment were not enacted until May 5, 1972, and claims submitted after that date "were wrongfully withheld because the director failed to reject these claims within a reasonable period of time." This argument is without merit.
Authority to withhold payment of claims submitted by a provider who has been suspended from the program is implicit in the statute, which provides for payment of claims only to persons authorized to provide Medicaid services, N.J.S.A. 30:4D-6(c) and 30:4D-3(h). N.J.A.C. 10:49-1.17(m)(2), R. 1972 d. 85, effective May 5, 1972, is explicit and provides that "[s]uspension, by the director, of any provider of service shall preclude such provider from submitting claims for payment...." The failure to promulgate regulations does not prevent an agency from performing its statutory duty, and therefore claims submitted after Kaplan's suspension from the program but before May 5, 1972 were properly withheld. See In re Heller's Suspension, 73 N.J. 292, 304-305 (1977), citing Securities and Exchange *498 Comm'n v. Chenery Corp., 332 U.S. 194, 201-202, 67 S.Ct. 1575, 1579-80, 91 L.Ed. 1995 (1947). Payment of claims submitted by Kaplan after May 5, 1972 was also properly withheld. Kaplan's argument that DMAHS wrongfully withheld payment because it failed to reject these claims within a reasonable period of time lacks merit. Since Kaplan had been suspended from the program, DMAHS had no responsibility to accept or reject the claims.
Kaplan's argument that he is entitled to interest on unpaid claims submitted prior to his suspension from the program is likewise without merit. It is the general rule that a governmental agency is not liable for interest as damages for the withholding of funds unless by statute or contract it has assumed that liability. East Orange v. Palmer, 52 N.J. 329, 334 (1968); In re Elizabeth Education Ass'n, 168 N.J. Super. 137, 139 (App.Div. 1979). There is no such provision in N.J.S.A. 30:4D-1 et seq.
Finally, Kaplan asks this court to award him attorney's fees pursuant to 42 U.S.C.A. § 1988, which provides, in pertinent part: "In any action or proceeding to enforce [42 U.S.C.A. § 1983] ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee...." 42 U.S.C.A. § 1983 establishes a private cause of action against any person "who, under color of ... [state law] subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...."
Kaplan is not entitled to relief under 42 U.S.C.A. § 1988 for the following reasons. First, the issue was not raised below and does not go to the court's jurisdiction or concern a matter of great public interest. Neider v. Royal Indemnity Ins. Co., 62 N.J. 229, 234 (1973). Second, Kaplan has not prevailed on his claim of a deprivation of his rights under the Federal Constitution and federal law. See Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). Finally, even if Kaplan did *499 establish a deprivation of a federal constitutional right, he has not established the elements of a § 1983 action, including designation of a proper defendant, and hence cannot claim relief under § 1988.
That part of the order requiring DMAHS to pay Kaplan $4,477.80 without interest or counsel fees is affirmed. That part of the order requiring Kaplan to pay DMAHS $8,711.96 pursuant to N.J.S.A. 30:4D-17(c) (1976) is reversed. Kaplan is directed to pay DMAHS $154 without interest.
NOTES
[1] In 1975 the Program Integrity Unit within the Medicaid Division recovered $1,467,000 in funds improperly paid; in addition, $752,000 was recovered from nursing home providers. (Statement from the Office of the Governor on signing the bill on September 15, 1976.)